Ubaldini *v.* C. I. T. Corporation, Appellant.

Argued March 4, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, PARKER, JAMES and RHODES, JJ.

R. *Lawrence Coughlin,* with him *David T. Davis, Jr.,* for appellant.

*E. F. McGovern,* for appellee.

OPINION BY PARKER, J., July 10, 1936:

The C. I. T. Corporation caused a judgment to be confessed against Louis Ubaldini on a negotiable promissory note containing a warrant of attorney authorizing such confession after maturity. The court below opened the judgment, framed an issue in which Ubaldini was made plaintiff and submitted the cause to a jury which made special findings of fact. Among the questions submitted to the jury and the answers were the following: "1. Did Defendant, Louis Ubaldini, pay the money due under said note, to wit: $755 to the rightful owner thereof? Answer, Yes. 2. Did the C. I. T. Corporation authorize or direct the Sutter-Nash Company to accept payments on any note given to it and purchased by the C. I. T. Corporation? Answer, Yes. 3. Did the C. I. T. Corporation authorize or direct the Sutter-Nash Company to collect the $755 on the note in question? Answer, Yes." The appellant contends that there was not sufficient evidence to support the findings of the jury and that it is entitled to judgment as a matter of law.

The sole matter with which we are concerned on this appeal involves a question of implied agency. Was the Sutter-Nash Motor Company the agent of C. I. T. Corporation for the purpose of receiving payments on ac-

count of the note? We will refer to the evidence supporting the findings as we are required to do in a case of this nature. On March 16, 1931 Ubaldini purchased from Sutter-Nash Motor Company a Nash sedan for the price of $1,165, turning in a used car for which he was credited with $410 and giving the note in question dated March 18, 1931, payable $500 April 1, $127.50 May 1, and $127.50 June 1, for the balance of the purchase price. At the same time the parties entered into a bailment lease covering the automobile. We will assume that on or about March 21, 1931, the motor company for a valuable consideration transferred the note to the finance company and that on the same day the C. I. T. Corporation gave its check to the motor company, the perforations showing that the check was paid by the bank on March 24, 1931. Ubaldini paid to the motor company $500 on April 1, 1931, and $255 on April 16, 1931, without the production of the note in either case. The motor company had over a period of three years prior to March, 1931 financed 500 installment sales to customers and it was the practice for many of these purchasers of cars when payments were due to the finance company to make payment to the motor company, such payments averaging 10 or 15 per week. The motor company at its office used two receipt books, one for its own accounts and one specially provided for payments due the finance company. The finance company knew that this receipt book was kept by the motor company and that when a payment was made to the motor company for the finance company triplicate receipts were made out and one was delivered to the customer, one was transmitted to the finance company and the third was retained by the motor company. The money so received for account of the finance company was on some occasions forwarded forthwith to the finance company and at other times given by the motor company to a collector named Jackson, employed by the finance com-

pany, which collector regularly called on the motor company for the purpose of receiving and checking up such payments by an examination of the receipt books. The collector would take with him the duplicate receipt and would initial the triplicate receipt to show "that the money was received by C. I. T." This practice applied to cases where payments were made after notes had been assigned to this finance company and the entire procedure was known to the manager of the local office of the C. I. T. Corporation.

That the note in question was negotiable and in possession of and the property of the finance company when the payments were made and that therefore the maker of the note was required to make payment to the holder is not seriously questioned. The appellee's answer is that the motor company was the agent of the finance company, that such agency may be implied from the conduct of the parties, that the acquiescence by the finance company in a long series of acts indicated an authorization to perform similar acts in the future.

The payments of $500 and of the balance of $255 involve somewhat different facts although they are interrelated. We will therefore first consider the legal situation with reference to the $500 payment. The agency asserted is one of implied agency and not that of agency by estoppel. In the case of an implied agency the relation to the principal is implied from the words and conduct of the parties and the circumstances of the particular case. It must be based upon facts for which the principal is responsible (2 C. J. 435). "The fact that a person has acted as agent for another in previous transactions is evidence tending to prove agency to act in a similar transaction": Dobbs v. Zink, 290 Pa. 243, 247, 138 A. 758. Also see Patterson v. Van Loon, 186 Pa. 367, 40 A. 495.

The burden of proof to establish agency is on him who would avail himself of the act of an agent to prove

the authority under which the agent acted: Amer. Car & Foundry Co. v. Alexandria Water Co., 221 Pa. 529, 536, 70 A. 867. It may be shown by actual knowledge, without disavowal, of repeated acts or by a course of conduct of the one assuming to act: Reifsnyder v. Dougherty, 301 Pa. 328, 333, 152 A. 98.

For a period of three years the C. I. T. Corporation had been financing installment sales to customers of the motor company under circumstances identical with that under which Ubaldini dealt with the parties and during that time on an average of 10 or 15 times a week installments had been paid by customers, makers of notes, to the motor company for account of the finance company. Not only did the finance company recognize such payments and not disavow the agency, but it was party to the manner in which receipts were given. With its knowledge receipts were made out in triplicate, one of which was delivered to it and to show that it had actually received the proceeds as between principal and agent it initialed the receipt retained by the motor company. This in our opinion was sufficient to sustain a finding by the jury that the motor company was the implied agent of the C. I. T. Corporation to receive payment of the note in question.

It was not conclusive against the maker of the note that he was not shown to have had knowledge of the manner in which collections were made for the finance company in other cases. "To establish implied agency by acts and declarations of the agent, it was not necessary to show defendant's [plaintiff's] knowledge of such acts. Implied agency is actual agency, and the difference between it and express agency is mainly one of method of proof; accordingly it is immaterial whether or not the third person had knowledge of the circumstances relied upon to establish the extent of the authority. In this respect implied authority differs from agency by estoppel where

there is no real agency but merely circumstances which estop a person from denying the existence of agency": Dobbs v. Zink, supra, p. 247. If, in fact, the motor company was authorized to accept payment for the defendant finance company, Ubaldini, the plaintiff, is entitled to the benefit of the payment whether he knew or did not know of the agency: Springfield National Bank v. Jeffers, 266 Mass. 248, 165 N. E. 474. The jury could disbelieve the testimony that no express authority had been given by the finance company to the motor company to accept payments for it. On the other hand there was a long and continued course of business between them in precisely similar transactions that would support the findings by the jury.

There are additional facts which under the circumstances have a bearing on the effect of the payment of $255. On April 10, 1931, C. I. T. Corporation notified Ubaldini in writing that it had purchased the note. That notice contained the following advice: "Please make each payment direct to our office." Notwithstanding such notice Ubaldini paid the balance of $255 to the motor company on April 16, 1931. On receipt of this notice the plaintiff went to the office of the C. I. T. Corporation and met the manager whom he showed the receipt for $500 and offered to pay the balance of $255 provided he received a certificate of title for the car. The manager asked Ubaldini to wait a couple of days, but, not hearing from him, Ubaldini again called on the manager on April 13th. Ubaldini testified in part as follows: "I says I am willing to pay balance of $255. He says, I can't do nothing. He told me, he says, you better get hold of Bates and have him arrested and let him produce certificate of title. At the same day I went to Squire Brown and I had Bates arrested." On April 15, 1931 Bates, the manager of the motor company called at Ubaldini's house and produced a certificate of title for the car. This certificate showed an encumbrance of

$681.58 in favor of the C. I. T. Corporation. Ubaldini then made the necessary application on the back of the certificate of title for a new title. An examination of the original title shows that on April 16, 1931, the C. I. T. Corporation receipted for the indebtedness which had been registered in its favor on the original certificate of title. The original certificate was taken to Harrisburg and a new certificate for the car issued by the Revenue Department in the name of the plaintiff. On receipt of such a title Ubaldini in accordance with the advice he had received from the C. I. T. Corporation, as he understood it, paid the balance of $255 at that time to the motor company and he then went to the office of the justice of the peace before whom he had sworn out a warrant for Bates for failure to deliver him a title within ten days, withdrew the prosecution and directed that Bates be released.

The finance company does not dispute the facts with relation to the manner in which its lien had been discharged but in answer thereto further alleged that when the car in question had been originally purchased the finance company had furnished the motor company $681.58 on what is described as a wholesale plan and that the lien which they were releasing was the lien which they had held against the car before Ubaldini entered the transaction. It further contends that there were two separate financing transactions, one for the original purchase of the car which was discharged and the second arising out of the sale to Ubaldini on time and that the motor company had failed to keep its agreement with the finance company to have a lien noted in favor of the finance company when the new certificate of title was issued to Ubaldini.

We are all of the opinion that these facts were sufficient to support a finding by the jury even, as to the $255, that when such payments were made to the motor company they were made to the motor company as agent

for the finance company. Now it is most apparent that the motor company used the $500 which they received from Ubaldini for the purpose of making the payment required to discharge the lien which the finance company held. It will also be observed that the manager of the finance company, when he interviewed Ubaldini, did not disavow the right of the motor company to act as agent for the finance company in the receipt of payments and, on the contrary, certainly left the impression with him that if the motor company could produce a certificate of title free of encumbrances he would be warranted in paying over the balance to the motor company. Notwithstanding the fact that the manager of the defendant corporation was fully cognizant of all the facts, it receipted for its lien against the car, which taken with the conversation of the manager with Ubaldini, warranted him in believing that the $255 should be paid through the motor company just as the $500 had been paid.

The acts of the C. I. T. Corporation on and after April 10, viewed as a whole, did not end the relationship of principal and agent which existed prior to that date.

·Judgment affirmed.